**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

ARNOLD LAMARR WEESE
and DAVID KENT MOSS,

       Plaintiffs,

vs.

SAVICORP, INC., SERGE V. MONROS,
and CRAIG WALDROP,

       Defendants.

Civil Action No.: 2:13-cv-41 (Bailey)

Electronically Filed June 6, 2013

**COMPLAINT**

For their complaint in this matter, Plaintiff Arnold LaMarr Weese and David Kent Moss ("Plaintiffs") aver as follows:

**PARTIES**

1.    Arnold LaMarr Weese ("Plaintiff Weese") is a resident and citizen of West Virginia and the purchaser of certain securities and/or security interests, as set forth in more detail below.

2.    David Kent Moss ("Plaintiff Moss") is a resident and citizen of West Virginia and the purchaser of certain securities and/or security interests, as set forth in more detail below.

3.    Defendant SaviCorp, Inc. ("SaviCorp") is, on information and belief, a corporation incorporated under the laws of Nevada, with its principal place of business in California.  SaviCorp is the issuer of the securities described herein.

4.    Serge V. Monros ("Monros") is founder, chairman and CEO of SaviCorp.  On information and belief, Monros is a citizen and resident of California.

6222904

5.      Craig Waldrop ("Waldrop") is the operator the website "Stocktriggers.com."  On information and belief, Waldrop is a citizen and resident of North Carolina.

<u>JURISDICTION</u>

6.      As set forth in more detail below, the fraudulent communications at issue occurred through the means of instrumentalities of interstate commerce, primarily the internet.

7.      Pursuant to 15 U.S.C. § 78aa and/or 78(v), this Court has subject matter jurisdiction of the federal securities law claims under the Securities Exchange Act of 1934 ("1934 Act) including, but not limited to claims under § 10-b [15 U.S.C.A § 78j(b)] of the 1934 Act and SEC Rule 10b-5 thereunder [17 C.F.R. § 240.l0b-5].

8.      In addition, the federal claims in this litigation arise under the Constitution and laws of the United States. This Court therefore also has original jurisdiction of the claims under 28 U.S.C § 1331.

9.      In addition, this Court has jurisdiction over the state law claims in this case because complete diversity exists between the parties.  All defendants are citizens of states other than West Virginia, of which the Plaintiffs are resident.   The amount in controversy exceeds $75,000, exclusive of interest and costs, and jurisdiction therefore exists under 28 U.S.C. § 1332.

10.      The Court furthermore may exercise supplemental jurisdiction over all claims in the case, pursuant under 28 U.S.C. § 1367, because they arise out of a common nucleus of operative fact.

<u>FACTS COMMON TO ALL COUNTS</u>

11.      SaviCorp is in business of developing for sale and licensing two products: the "DynoValve" and the "DynoValve Pro."  Both products were invented by Monros, who is the CEO of SaviCorp and its largest stockholder.  The DynoValve is applicable to gasoline internal

combustion engines; the DynoValve Pro is applicable to diesel engines. Both products are marketed by SaviCorp as being able to increase mileage and reduce fuel use, and to reduce emissions produced by vehicles employing the DynoValve or DynoValve Pro (hereafter, collectively, the "DynoValve").

12.     Waldrop operates an internet-based stock trading club ("Stocktriggers"), providing advice and information regarding stock trades found at the URL http://www.stocktriggers.com.   Stocktriggers purports to offer "professional, real-time stock trading, investing and educations services."  Stocktriggers requires payment of membership fees to obtain any of its services and to participate in online discussion forums, referred to on the site as "chat rooms."

13.     Prior to May, 2010, Plaintiff Weese became a paid member of Stocktriggers.

14.     On November 12, 2011, Waldrop submitted, through the Stocktriggers site, an electronic message to Defendant Weese, stating in part: "I have been presented an opportunity I am putting out some 'feeler' for right now and I thought about you.  Do you personally, or do you have any colleagues who trust you, who may have a 6 or low 7 figure investment capital for an intermediate term (months) opportunity?  The risk/reward is potentially life changing.  I can call you to privately discuss if you or anyone you know may want the details."

15.     In the time period from November 2010 though July 2011, Plaintiff Weese had numerous discussions with Waldrop through electronic messages posted on the Stocktriggers website.  In general, Waldrop promoted investment in SaviCorp.  Waldrop repeatedly promoted SaviCorp and stated that an investment in SaviCorp was an opportunity and made representations, discussed more fully below, as to the favorable business prospects and opportunities for SaviCorp.

16.     In response to Waldrop's urging to locate additional investors, Plaintiff Weese contacted Plaintiff Moss about the potential investment opportunity presented to him by Waldrop.  During the course of the promotion of SaviCorp, Plaintiff Weese notified Waldrop that he (Plaintiff Weese) was keeping Plaintiff Moss informed of the discussions.  For example, on November 13, 2012, Plaintiff Weese responded to Waldrop's inquiry as to a "life changing" opportunity in part, "I am just going out now for my weekly Wednesday social/strategy meeting with some of my friends and was going to bring this up to them however they are somewhat more conservative than myself. . .I will let them know that only with a very serious interest will more details be spoken of."

17.     Plaintiff Weese did in fact discuss the "life changing opportunity" proposed by Waldrop.  Over the succeeding months, up to and including July 2011, Plaintiff Weese routinely printed out all communications with Waldrop and dropped off the printouts in the mailbox of Plaintiff Moss on a periodic basis.

18.     Waldrop was placed on notice that representations made to Plaintiff Weese would be conveyed to Plaintiff Moss. On multiple occasions, Plaintiff Weese notified that Waldrop that he would communicate the information and representations regarding SaviCorp to Plaintiff Moss.

19.     Waldrop made representations to Plaintiff Weese as to SaviCorp with the expectation that they would be shared with Plaintiff Moss.  Waldrop was informed on repeated occasions that Plaintiff Weese had, in fact conveyed the information to Plaintiff Moss.   In addition, in a phone conversation on or about January 6, 2011, Plaintiff Moss spoke by telephone with Waldrop.  In the call, Plaintiff Moss confirmed his interest in the proposal being made through Plaintiff Weese and his (Plaintiff Moss's) continuing involvement in the review of

information submitted to Plaintiff Weese. Plaintiff Moss further disclosed that he had reviewed the document discussed below as the "Savi Prospectus" and asked Waldrop numerous questions with regard to the document. Waldrop therefore had actual knowledge that the statements and representations made as to SaviCorp and regarding investment in SaviCorp were being conveyed to Plaintiff Moss.

### COUNT I – BREACH OF CONTRACT

20.    The Plaintiffs repeat and reallege, and incorporate herein by reference as if set forth verbatim, the allegations of paragraphs 1 through 19.

21.    On or about June 7, 2011, Plaintiff Weese entered into a contract with Monros for the purchase of 5,000,000 shares of SaviCorp common stock.  The agreed purchase price was the sum of $25,000, or $0.005 per share.  A true copy of the writing evidencing the contract is attached hereto as Exh. A.  Plaintiff Weese paid the agree purchase price by wire transfer, on or about June 7, 2011.

22.    On or about June 7, 2011, Plaintiff Moss entered into a contract with Monros for the purchase of 5,000,000 shares of SaviCorp common stock.  The agreed purchase price was the sum of $25,000, or $0.005 per share, to be paid to SaviCorp.  A true copy of the writing evidencing the contract is attached hereto as Exh. B.  Plaintiff Moss paid the agreed purchase price by wire transfer, on or about June 7, 2011.

23.    On or about July 6, 2011, Plaintiff Weese entered into a contract with Monros for the purchase of 50,000,000 shares of SaviCorp common stock.  The agreed purchase price was the sum of $250,000, or $0.005 per share, to be paid to SaviCorp.  A true copy of the writing evidencing the agreement is attached hereto as Exh. C.  Plaintiff Weese paid the agreed purchase price by wire transfer, on or about July 6, 2011.

24.     On or about July 6, 2011, Plaintiff Moss entered into a contract with Monros for the purchase of 30,000,000 shares of SaviCorp common stock.  The agreed purchase price was the sum of $150,000, or $0.005 per share, to be paid to SaviCorp.  A true copy of the writing evidencing the agreement is attached hereto as Exh. D.  Plaintiff Weese paid the agree purchase price by wire transfer, on or about July 6, 2011.

25.     After acceptance of the purchase price, Monros failed to arrange transfer of any of his stock to Plaintiff Moss or Plaintiff Weese.  Furthermore, Monros made no arrangements for issuance, by SaviCorp, of any stock in lieu of the shares promised under the written agreement.

26.     Eventually, SaviCorp tendered to Waldrop share certificates, in the amounts specified in the contract of sale between Monros and the Plaintiffs.  The share certificates were not transferred shares from Monros.  The restriction was contrary to the representation made to the Plaintiffs, as set forth in more detail in Count II.

27.     Monros is in material breach of the agreements dated June 7 and July 7, 2011, and Plaintiffs are entitled to rescission of the agreement and/or damages, at their election.

28.     Based on the allegations of Count II, below, which are incorporated herein by reference, the contracts were procured by fraud, by misrepresentation of material facts, and the failure to disclose material facts.

29.     The Plaintiffs are, therefore, entitled to rescission of the contracts based on the fraud and misrepresentation identified in Count II, below.

### COUNT II – FRAUD UNDER SECTION 10B-5  AND W. VA. CODE 32-1-101

30.     The Plaintiffs repeat and reallege, as if set forth verbatim, the allegations of paragraphs 1 through 29.

31.     On or about December 23, 2010, Waldrop delivered to Plaintiff Weese, through a private login account and password, which were provided by the electronic message system on the Stocktriggers site, a document entitled "Confidential Company Information."   A true and accurate copy of the document is attached hereto as Exh. E.   The document related to "Savi Media Group, Inc." and in the heading on the first page stated "Patented technology: Electronically Controlled Blowby Gas Valves" and stated "Product Name:DynoValve(DV)." For simplicity, the document will be referred to as the "Savi Prospectus."

32.     The Savi Prospectus's representation that there were patents as to the DynoValve was false.   No patents had been issued as of that time.   Because information on issued patent was and is publicly available, Waldrop had reason to know the statement was false.

33.     The Savi Prospectus states: "[t]therefore it is important to view this as an opportunity for a capital infusion to resolve the current dilution overhang for the company prior to making the following contract and news announcements."   The statement was false because there was no reasonable basis for stating that there would be contracts and news announcements by SaviCorp.   The statements were misleading in implying the potential for contracts.   The specific contractual opportunities identified in the Savi Prospectus are described in detail below.

34.     The Savi Prospectus made the further claim:

> "I was then asked to do private closed course track testing of the products in a controlled environment here in NC, but instead this led to FLEET testing among a group of car dealerships in the Southeast to obtain both fuel economy and emissions results from a "controlled" group of trucks and cars that were used in consistent patterns.   The results of this testing were fully documented by my contacts, demonstrating significantly positive outcomes."

35.     The foregoing statement was false and misleading because there was no testing by any fleet of vehicles by any independent third party.   The claim was misleading because it

suggested that there was independent verification of the benefits of the DynoValve in "Fleet testing" by third parties that had been substantiated.  No such testing occurred.

36.     The Savi Prospectus made the further claim:

> Additional discussions and meetings regarding the product potential took place in 2008 and 2009, which led to additional individual fleet testing by several companies and organizations in California, including the L.A. Fire Department, the California Bureau of Auto Repair (where all smog checks are conducted for the state, similar to our Inspection Stations here in NC), and a number of private trucking and fleet companies.  This led to the state of California conducting product tests at their on-site test facility on a variety of consumer vehicles (passenger cars, picks-up's and SUV's, and hybrids) which could lead to a potential Executive Order (EO) from the state.  This EO was just issued to the company in September of 2010, and was the official "go-ahead" for the California Bureau of Auto Repair, who has since purchased 3000 units to begin the conversion process for consumer vehicles who fail to meet smog check requirements.

37.     The statements of the preceding paragraph are false or misleading in the following respects:

a.   There were no tests by "a number of private trucking and fleet companies."  The only evaluations were sporadic, not independently verified, and did not "lead to the state of California conducting product tests."

b.   There was no Executive Order issued authorizing purchase or acquisition of DynoValve.  The only Executive Order issued by any California governmental institution was Executive Order D-677 by the California Air Resources Board discussed below, which contains no purchase authorization.

c. The California Bureau of Auto Repair did not purchase 3000 DynoValve units and no such order was issued to SaviCorp.

d. There were not tests by the "state of California . . . on a variety of consumer vehicles (passenger cars, picks-up's [sic] an SUV's, and hybrids) which could lead to an executive order (EO) from the state." Read in context with the next sentence ("This EO was just issued to the company in September of 2010 and was the official 'goahead' for the California Bureau of Auto repair who has since purchased 3000 units . . . ") the statement suggests an Executive Order authorizing purchase.  In fact, the only Executive Order issued by any California governmental entity occurred after the test of two vehicles by the California Air Resources Board.  The Board issued Executive Order D-677, which simply authorized an exemption to the general prohibition under California law against alteration of pollution control systems, because the Board found that the DynoValve did not reduce the effectiveness of pollution control systems.  The order expressly stated that the order did not constitute a "certification, accreditation or approval  . . .  of any claims of the applicant concerning anti-pollution benefits or any alleged benefits of SaviCorp, Inc.'s Econo Valve/Dyno Valve kit." The order confirmed no benefits of DynoValve and only confirmed that it would not harm pollution control for certain vehicles.  The statement in the Savi Prospectus was further false and misleading because it would cause a

reasonable reader to believe that there were substantive tests of the effectiveness of the DynoValve.

38.  The Savi Prospectus further stated: "Cornell Capital Partners has agreed to a settlement of $1.7million from Serge's company to officially dissolve their current financial agreement, and therefore eliminate the 2 billion outstanding shares/warrants, resulting in a public float including company officer shares of roughly 1 billion shares."  The claim was false because the "public float" would be in excess of 1,400,000,000 after elimination of any shares or share warrants of Cornell Capital Partners, even if company officers were excluded.  However, if SaviCorp officers were included, the float would be in excess of two billion shares.  The statement was misleading by inaccurately describing the portion of the company that the Plaintiffs could expect to acquire from the proposal being made.

39.  The Savi Prospectus further stated: ". . . ridding the stock of this dilution overhang can only be considered a positive development in terms of upside stock potential with the upcoming news and product revenue growth expectations."  The statement was false because there was no basis for asserting that there would be upcoming news to disclose with respect to "product revenue growth" and no objective basis for expecting underlying revenue growth.

40.  The Savi Prospectus further stated: ". . . .the company decided NOT to release contract and product revenue news in recent months, as [sic] to avoid a situation where the stock would merely create tradable ' jumps' by 50-100% in the stock, only to retrace again due to dilution, uncertainty, and related financial concerns."  The statement was false in implying that the company had specific news to disclose, that the company had not previously disclosed, as to products and revenue that would be favorable. The statement was further false in stating that such news would "create tradable 'jumps' by 50-100%" in the stock, because it falsely implied

that there existed unreleased news of a nature such that the company had a reasonable expectation of such large (though transient) increases in stock value.  In fact, there were no objectively reasonable expectations of sales or revenue prospects that would justify any such jumps in value.

41.     The statement in the preceding paragraph was also false in that one of the items of news that related to sales that appears to be truthful is the representation, later in the Savi Prospectus, as to the sale of 250 units to McCarthy Construction Company.  SaviCorp had disclosed that information in December, 2010.  SaviCorp had not made any decision to withhold that information and release it later, so as to avoid creating "tradable jumps."

42.     The Savi Prospectus further stated:

> "The California Bureau of Auto Repair has already purchased 3000 units, and they are projecting a minimum annual need of 10,000 units in the years ahead.

No such purchase had occurred nor had the Bureau projected that it would purchase 10,000 more units.

43.     The Savi Prospectus further stated:

> The L.A. Fire Department has purchased 700 units which are currently being installed by company transit vehicles.

The statement is false because the Los Angeles Fire Department made no such purchase of DynoValve units.

44.     The Savi Prospectus further stated:

> Pepsi-Co/Frito Lay trucks are currently at the factory having installs done for testing for a potential fleet installation in 2011.

45.     On information and belief the claim of the preceding paragraph is misleading. The statement objectively suggests that there is an ongoing evaluation by Pepsi-Co/Frito Lay and consideration of "fleet installation."   The basis for the belief that such a claim is false is that no

fleet installation of the DynoValve occurred, based on subsequent reports by SaviCorp and based on a review of information available through searches on the world wide web. No subsequent reports by SaviCorp mention the sale of any kind to Pepsi-Co/Frito Lay nor are any such sales disclosed in any search for information on the world wide web.

46.    The Savi Prospectus further stated:

An advertising campaign with DirecTV is being finalized as of 12/17/10 with a plan to launch into late 2010/early 2011, including spots on the JumboTron at Times Square in NYC.

47.    On information and belief, the claims of the preceding paragraph were false.  The basis for the belief is that no such marketing campaign with DirectTV occurred, and that later disclosures showed that SaviCorp lacked any operating capital in December, 2010 with which it could have had paid for a major advertising campaign.  Because the capital sought in the Savi Prospectus was intended to pay off other holders of debt or equity (the Cornell Capital Partners) there was no basis to expect SaviCorp to have capital for such an advertising campaign.

48.    The Savi Prospectus further stated:

In the testing by the state of California of the cleanest emissions vehicle produced in America to date, the Ford Focus was found to have 30% reduced emission with the installation of the DV.

49.    On information and belief, the forgoing claims are false and misleading because the California Air Resources Board tests of the ford Focus did not show a 30% reduction in emissions. Instead, it showed only that, when equipped with the DynoValve, the car had greatly reduced emissions compared to the standards set by the government.   The California Air Resources Board did not test whether the DynoValve improved the performance of the car's emission control system.

50.     The Savi Prospectus further stated:

> "The company has had roughly $150,000 of product revenues to date, nearly all of which has been received in the last several months.

51.     The foregoing claims are false.  Subsequently filed financial reports of SaviCorp do not show revenue of $150,000 or any substantial part of that sum, as being obtained in 2010. Later financial reports show revenue of $2,026 in 2010, and $38,930 in 2011.

52.     The Savi Prospectus further stated:

> "Over the course of the next year, existing contracts project revenues in the range of $1.5 to 2.0 million."

53.     The foregoing claims are false and misleading.  No existing contracts existed that would have provided any objectively reasonable basis to project revenue of $1.5 to $2.0 million, and SaviCorp later reported actual revenue in 2011 of only $38,930.

54.     The Savi Prospectus further suggested that there was an objective basis on which to believe that a contractual arrangement with Walmart were under discussion and might arise. The document made a number of statements that individually and collectively conveyed to the reader that there was a basis for the company to hope for revenue from sales to Walmart.  The statements included the following:

> WalMart is currently involved in the testing of a LPG conversion kit which they plan to initially install on 3000 company vehicles, at a cost of roughly $5,000 each.  The development of this relationship and official news of such a roll-out will be accompanied by a second Executive Order from the State of California for the LPG conversion kit, which they are currently finishing up state testing with for the EO.
>
> .   .   .   .

> Over the course of the next year, existing contracts project revenues in the range of $1.5 to 2.0 million.  This does not include any revenue from a WalMart LPG fleet conversion, and does not include any other contracts that are currently being negotiated. Additional contract revenue from WalMart or other clients could fall into a range of between $5 and $15 million in the next 12 months.
>
> .   .   .   .

Serge's LPG conversion system carries a cost of roughly $5k, allowing the possibility for 800,000+ trucks to convert and meet the new Federal standards.

. . . .

The WalMart Effect ---

Have you ever seen the impact on a stock (especially a relatively small company, just beginning to emerge) who announces a contract with WalMart?  Over my years in stock trading I have only caught ONE of these trades at just the right time, and it was absolutely stunning to say the least.  It is not uncommon to see stock price moves in the range of 400% to 2000% within a 1-2 week period of time, depending on where the stock began its initial move.  WalMart announcements are the absolute difference maker for small companies.  Even the speculation of what a contract with WalMart might lead to is enough to create significant price and volume moves in a stock.

55.    These preceding statements regarding Walmart were false, because there was no plan by Walmart to use any LPG conversion kit created by Serge Monros and no objective basis to expect that Walmart might purchase any such kits, if the kits actually exist. The repeated references to Walmart and the references to contracts and sales objectively imply to a reasonable reader that there is a factual basis for potential contracts with Walmart.  There was no such basis.

56.    The statement that "[a]ddtional contract revenue from WalMart or other clients could fall into a range of between $5 and $15 million in the next 12 months" contains additional false and misleading claims, because it implies to an objective reader that there are contractual discussions that would provide some objective basis for the projection.  On information and belief the statement as to "WalMart or other clients" is either false or misleading.  The basis for this belief is that SaviCorp has disclosed no existing prior contracts, nor discussions regarding them, that would have provided any reasonable basis to project revenue of $1.5 to $2.0 million. SaviCorp later reported actual revenue in 2011 as $38,930.  A review of subsequent filings by SaviCorp with the SEC and at with OTC Markets  Group, Inc. (the "Pink Sheets" found at www.otcmarkets.com ) disclose no such contractual discussions or negotiations.  A search of the internet also reveals no such contracts or contractual discussions.

57.     In the Savi Prospectus, Waldrop expressly advised the Plaintiffs that sales of the stock would be possible.  Waldrop stated:

> Let's assume that sales do not escalate in the year ahead expected and the stock only sees ups and downs as news and events unfold. Therefore it would be possible that the stock could remain between .02 and .05, only allowing modes amounts of shares to be sold from time to time without actually destroying the stock price (keeping it above .01 for example).  In this case, the investor(s) would be forced to be patient, and slowly piece out a large position of this nature over a period of weeks or months.

From this statement, a reasonable person would conclude that sales of the shares would be possible, restrained only by practical considerations related to maintaining the market price.

58.     Each of the foregoing statements in paragraphs 31 through 57, referred to collectively as the "Prospectus Claims," both individually and as a whole, would be material to a reasonable person's evaluation of the value of SaviCorp and its stock.

59.     Each of the Prospectus Claims, and the Prospectus Claims collectively, were in fact relied on by Plaintiffs in their decision to purchase SaviCorp stock.

60.     To the extent that some statements in the Prospectus Claims may be characterized as opinions, the statements implied the existence of factual support for the opinion.  There was no such support.  On information and belief, Waldrop did not in fact hold the opinions expressed nor did he believe them.  The basis for this belief by the Plaintiffs is that Waldrop was in a position to investigate very easily the factual predicates for any opinions regarding SaviCorp.  In addition, he had the ability to make inquiry directly to personnel at SaviCorp as to the claims he made and ascertain whether any objective facts would support such claims.  Furthermore, the direct and implied claims as to sales and contracts were numerous and detailed and could not have arisen by mistake.

61.     Waldrop had a motive to mislead the Plaintiffs.  He was the owner of a substantial number of shares in SaviCorp as of the time of the fraudulent statements identified above, and made in late 2011 and during 2012.  An influx of capital sufficient to allow SaviCorp to recover the stock issued to Cornell Capital Partners would reduce the dilution of Waldrop's shares.  In addition, the news of the reduction in outstanding shares and the infusion of capital would logically be expected to raise the value of SaviCorp stock. Finally, as he conceded in the Savi Prospectus, Monros suggested to Waldrop that Savi Corp might make Waldrop a "market maker."

62.     Monros had a motive to mislead the Plaintiffs.  He was the largest owner of shares in SaviCorp as of the time of the fraudulent statements identified above, and made in late 2012 and in 2011.  An influx of capital sufficient to allow SaviCorp to recover the stock issued to Cornell Capital Partners would reduce the dilution of the Monros's shares.  Further, the news of the reduction in outstanding shares and the infusion of capital would logically be expected to raise the value of SaviCorp stock.

63.     During the course of the foregoing communications, and prior to the purchase agreements executed in June and July of 2011, Waldrop failed to disclose the following material facts which Waldrop knew, or should have known, regarding SaviCorp:

a.     SaviCorp had been made the subject of an investigation by the Securities and Exchange Commission ("SEC") regarding its securities activities.  The non-disclosure was material because the existence of federal securities investigations affects the reputation of the company in the marketplace and because knowledge of the investigation would have induced the Plaintiffs to be more searching in their review of representations made to them.

b.      The technology underlying the DynoValve was not owned by SaviCorp, nor did SaviCorp have economically meaningful rights in the underlying technology.   The intellectual property underlying the DynoValve was owned by a different company, controlled by Monros, known as His Devine Vehicle, Inc. ("HDV").  SaviCorp lacked an exclusive license, and was also not in compliance with the terms of the license.  HDV, therefore, could deprive SaviCorp of access to its sole source of potential revenue.  Moreover, the lack of exclusivity meant that HDV could, at nearly any time, deprive the license (even when in effect) of a large part of its value.  The non-disclosure was highly material, because it related to the ability of SaviCorp to capitalize on any value that the market might attach to DynoValve.

c.      SaviCorp had issued hundreds of millions of shares to additional persons, not disclosed to the Plaintiffs, substantially diluting any prospect of recovery, should SaviCorp become an economically successful entity.

d.      Although he notified the Plaintiffs of problems in payment by SaviCorp of the note to Cornell Capital Partners, Waldrop did not notify Plaintiffs of the default by SaviCorp on two additional notes for $200,000 and $500,000.

e.      As of June, 2011, SaviCorp had had no meaningful sales of any kind and the company, in fact, had no operating cash.  Therefore, the removal of the Cornell Capital debt was not sufficient to allow the company to further develop any economic potential of the DynoValve without substantial additional capital, which would dilute the interests of Plaintiff Moss and Plaintiff Weese; and

f.      Waldrop did not advise Plaintiffs Moss and Weese that transfer of any shares would be restricted under federal securities law and that SaviCorp had no intention or plans to take steps necessary to allow removal of restriction on transfers.

6222904

17

64.     On or about January 6, 2011, Plaintiff Moss spoke by telephone with Waldrop. During the telephone call, Plaintiff Moss disclosed that he had reviewed the Savi Prospectus provided to Plaintiff Weese, and that he had questions arising from the document and other matters.

65.     During the course of that call, Waldrop never corrected the false and misleading claims made in the Savi Prospectus or in other communications with Plaintiff Weese.  During the course of the call, Waldrop never corrected the concealment of material facts, identified above, in which he was engaged regarding the SaviCorp stock.

66.     During the course of that call, Waldrop repeatedly assured Plaintiff Moss that the proposed acquisition of SaviCorp stock was a great opportunity.   In making those representations, Waldrop failed to correct the false statements and fraudulent concealments discussed above.

67.     When Plaintiff Moss raised with Waldrop the question of what the "biggest problems" were with SaviCorp and the proposal, Waldrop failed to identify the absence of revenue, the lack of ownership of or secure rights to the DynoValve patents, the existing debts of the corporation, the absence of capital to commence operations, or any of the other problems facing the company.

68.     During the course of the telephone call, Waldrop expressly represented that the "patents" held by SaviCorp were worth $250,000,000.00.  Waldrop had no basis for any such assertion or estimate, nor any basis to assert that SaviCorp owned multiple patents.  The sole patent issued to Monros has a market value contingent on successful development of sales and a marketable technology, which has not occurred.

69.     The knowing and willful nature of the fraudulent concealment and the fraudulent statements by Waldrop is evidenced by the extensive and detailed nature of the statements, which could not have arisen by inadvertence, and his ability to have ascertained correct information.  In addition, it is further evidenced by the failure to correct them during the January 6, 2011 telephone call from Plaintiff Moss, and is also evidenced by the pattern of false and misleading statements continued after the stock purchases in June and July of 2011.

70.     Subsequent to the stock purchase contracts of June 6 and July 7, 2011, Waldrop made a series of false and misleading statements with respect to the failure of Monros or SaviCorp to provide the stock shares called for under the agreements.  For example, with regard to the reduced revenue, Waldrop stated that SaviCorp had "legally deferred some revenue prior to the report so that the YAG [Cornell Capital Partners] deal could be more easily negotiated." Subsequent filings by SaviCorp have disclosed no such deferred revenue.

71.     Waldrop further asserted that there were "key operating relationships and distribution contracts with other companies that are coming together right now to create channels for which the products will be marketed and distributed."  On information and belief, SaviCorp had no contracts with the reasonable likelihood of being executed that would improve the marketing or distribution of its product.  Waldrop further stated that there were substantial business relations being developed with Union Pacific that would provide a market for the DynoValve.  No such contract has been entered into and no statements by SaviCorp indicate the existence of discussions regarding such a contract.

72.     The Plaintiffs have suffered damage due to the false claims and material and fraudulent non-disclosures identified above. The Plaintiffs actually purchased stock shares based

on explicit representations that directly affect the value of the stock, and the falsity of those representations has prevented the stock from acquiring the value represented by to the Plaintiffs.

73.     The Plaintiffs are entitled, at their election to damages for the diminution in the value of the stock or recession of the sales agreement, and a refund of their purchase prices upon tender of the stock.

74.     SaviCorp and Monros are liable for the actions of Waldrop and the Plaintiffs are entitled to recover from any one or more of the Defendants all damages incurred by reason of the fraudulent actions of Waldrop.

### COUNT III– VICARIOUS LIABILITY

75.     The Plaintiffs repeat and reallege, and incorporate herein by reference as if set forth verbatim, the allegations of paragraphs 1 through 74.

76.     Waldrop was the apparent agent of SaviCorp and Monros.  The apparent agency arose from the use of Waldrop, by SaviCorp and Monros, to conduct all negotiations on behalf SaviCorp and Monros.  All dealings between the Plaintiffs and SaviCorp and Monros, regarding the stock purchases evidence by Exhibits A, B, C and D, occurred through Waldrop.

77.     On information and belief, Waldrop was also the actual agent for Monros and Waldrop.  The basis for this belief are 1) the statements of Waldrop that the had been retained by SaviCorp, 2) the exclusive use of Waldrop, by SaviCorp and Monros, to negotiate with the Plaintiffs with regard to the contracts evidenced in Exhibits A, B, C and D,  and 3) the continued use of Monros and SaviCorp of Waldrop, after July, 2011, to communicate with the Plaintiffs.

78.     Monros is responsible for the false and misleading statements set forth in the Count II because he had direct and/or indirect control over the actions of Waldrop.  As the CEO and largest stockholder of SaviCorp he could direct agents of SaviCorp in the performance of

their agreements with SaviCorp.   On information and belief, the use made by Monros of Waldrop was either made with knowledge of the statements made by Waldrop or with reckless indifference to the nature of the claims being made.   The basis for this belief is that the statements made by Waldrop were extensive and over a long period.   During that time, Waldrop represented that he was in regular communication with Monros.   Monros ultimately executed the contracts attached as Exhibits A, B, C and D, with no communication as to the terms of the contracts other than that coming through Waldrop.

79.     SaviCorp and Monros are liable, under the doctrine of respondeat superior, for the actions of Waldrop.

80.     In addition, Monros retained Waldrop to assist in locating Monros is therefore liable under the provisions of 15 U.S.C. §77o and/or 15 U.S.C. § 78t(a) for the wrongful acts of Monros.

### COUNT IV–COMMON LAW FRAUD

81.     The Plaintiffs repeat and reallege, and incorporate herein by reference as if set forth verbatim, the allegations of paragraphs 1 through 80.

82.     The sales agreements attached as Exhibits A, B, C and D were procured by fraudulent statements of Waldrop, and by the concealment of material facts, as set forth above.

83.     The Plaintiffs paid the consideration set forth in the contracts based on the fraudulent statements and failures to disclose material facts set forth above.

84.     The fraudulent statements and failures to disclose cased the near total loss of the payments by the Plaintiffs, because the stock acquired cannot be transferred and because its value, even if transferrable, is almost non-existent.

85.     The stock provided to the Plaintiffs is not only worth less than they paid for it. It is also worth far less than the Plaintiffs had a right to expect, based on the representations of and fraudulent concealment of Waldrop.

86.     The Plaintiffs are entitled to damages based on the benefit-of-the-bargain, and to recover, from Waldrop, SaviCorp and Monros, the reasonable value of the stock had the statements of Waldrop been true, and had he not engaged in fraudulent concealment, in an amount to be ascertained at trial but not less than $2,000,000 for each Plaintiff.

87.     The fraudulent statements of Waldrop were made with actual knowledge of their falsity or with willful indifference to their truth or falsity.  Waldrop thus acted wantonly, willfully and/or maliciously.

88.     The actions of Waldrop were undertaken as the agent of Monros and SaviCorp.

89.     In addition, the actions of Waldrop, including his false statements and his fraudulent concealment,  were ratified by Monros and SaviCorp.

90.     The Plaintiffs are entitled to punitive damages against Waldrop, Monros and SaviCorp as exemplary damages for the common law fraud set forth above.

### COUNT V– UNLAWFUL SALE

91.     The Plaintiffs repeat and reallege, and incorporate herein by reference as if set forth verbatim, the allegations of paragraphs 1 through 90.

92.     The offering of securities and the sale under the contracts of June 7, 2011 and July 6, 2011 were not the subject of any registration statement filed with the SEC or any West Virginia governmental entity.

93.     The offering of securities and the sale under the contracts of June 7, 2011 and July 6, 2011 did not comply with any exemption from registration.

94.     The offering of securities and the sale under the contracts of June 7, 2011 and July 6, 2011 was an unlawful act by Craig Waldrop and Serge Monros.

95.     Pursuant to 17 U.S.C. § 77l(2) and W. Va. Code § 32-4-418, the Plaintiff are entitled to rescission of the sale, recovery of all sums paid, and their costs and attorneys fees expended in this action.

### COUNT VI – UNLAWFUL ACTIONS BY UNREGISTERED BROKER

96.     Plaintiffs repeat and reallege, and incorporate herein by reference as if set forth verbatim, the allegations of paragraphs 1 through 95.

97.     Waldrop was retained by SaviCorp and/or Monros to locate and obtain individuals who would be willing to purchase securities in SaviCorp and therefore provide capital to SaviCorp to use in settling the claims and rights of the Cornell Capital Group.

98.     The financial arrangement under which Waldrop operated is not known to the Plaintiffs.  Waldrop, however, asserted that he had been "asked" to find individuals interested in such a transaction.

99.     Throughout the transaction leading up to the sales agreements of June 7, 2011 and July 6, 2011 (attached as Exhibits A, B, C and D), Waldrop was the exclusive conduit for communication with SaviCorp regarding the transaction and the exclusive person with whom the Plaintiffs negotiated.

100.    Throughout the time leading up to the transaction, Waldrop gave direction as to details of carrying out the transaction, including that for wiring money.  Some time after the Plaintiff's wired the agreed-upon sum, Waldrop notified the Plaintiffs that he had received the stock certificates and would hold them until a more detailed agreement regarding the transaction was signed by SaviCorp and the Plaintiffs.

101.    For a period of several months, Waldrop transmitted to Plaintiff Weese draft agreements and answered questions regarding those draft agreements.   The first proposal transmitted by Waldrop was structured as a loan, evidenced by a note that was convertible to shares of stock in SaviCorp at a specified price.   The second proposal transmitted by Waldrop was structured as a stock purchase agreement.

102.    With regard to both, Waldrop was the exclusive person with whom the Plaintiffs negotiated,  Waldrop, from time to time, would include statements that, he represented, had come from officers or attorneys of SaviCorp.

103.    The communications occurred overwhelmingly through the Stocktriggers site as electronic messages.

104.    During the negotiation, Waldrop kept possession of the stock certificates.

105.    By reason of his actions, Waldrop was acting as a broker within the meaning of 15 U.S.C. 78c(a)(4)(A).

106.    Throughout the transaction, Waldrop used the mail and other instrumentalities of interstate commerce, including the internet, to effect the transaction.

107.    Waldrop was not registered as a broker with the Securities and Exchange Commission, and his actions therefore were unlawful under 1934 Act.

108.    Waldrop, by his actions, qualified as a "broker-dealer" under W. Va. Code § 32-2-401(c) or, alternatively, as an "agent" under W. Va. Code § 32-2-401(b).

109.    Waldrop was not registered as a broker or agent in the state of West Virginia. His actions as a broker or were therefore unlawful under W. Va. Code § 32-2-201(a).

110.    The plaintiffs are entitled to damages and to rescission of the sales, pursuant to W. Va. Code § 32-4-410(a).

111.     In addition to liability for his own acts, Defendant Monros is liable for all damages incurred by the Plaintiffs by reason of his status as an officer and director of SaviCorp, and as person with direct and indirect control over SaviCorp, under W. Va. Code § 32-4-410(b).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs David Kent Moss and Arnold Lemarr Weese pray for the following relief:

1.     That the share purchase agreements of June 7, 2011 and July 6, 2011 be rescinded, or alternatively, that the contracts be declared breached;

2.     That the Plaintiffs receive in full their purchase price, together with, with interest thereon, and their costs and attorneys' fees;

3.     That the Plaintiffs be awarded, alternatively, their damages for violation of the Securities Act of 1934 and for violations of the West Virginia Uniform Securities Act, together with interest thereon and all costs and attorneys' fees;

4.     That the Plaintiff be awarded their damages, in an amount yet to be ascertained, but not less than $2,000,000.00 for the fraud perpetrated upon them and the loss of benefit of the bargain;

5.     That the Plaintiffs be awarded exemplary damages, pursuant to the common law of West Virginia, sufficient to deter further wrongful acts of the defendants.

6.     That the Plaintiffs be awarded all such other and further relief as, under the facts as ascertained by the Court, they may be entitled by law

REQUEST FOR  TRIAL BY JURY

The Plaintiffs request a trial by jury on all matters subject to trial by jury.

Respectfully submitted this 6th day of June, 2013.


*/s/ Gordon H. Copland*
Gordon H. Copland (WV ID# 828)

STEPTOE & JOHNSON PLLC          400 White Oaks Blvd.
        Of Counsel              Bridgeport, WV 26330
                                (304) 933-8000

                                *Counsel for Plaintiffs Arnold Lemarr Weese
                                and David Kent Moss*

6222904                              26